**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**TISSUENET CUSTOM APPLICATIONS,**
**LLC & TISSUENET DISTRIBUTION**
**SERVICES, LLC,**

      **Plaintiffs,**

-vs-                                                            Case No. 6:05-cv-1931-Orl-31KRS

**BLOOD & TISSUE CENTER OF**
**CENTRAL TEXAS & MARSHALL G.**
**COTHRAN,**

      **Defendants.**

## ORDER

The Plaintiffs, Tissuenet Custom Applications, LLC ("TCA") and Tissuenet Distribution Services, LLC ("TDS") sued the Blood and Tissue Center of Central Texas ("BTC") and Marshall G. Cothran ("Cothran"), asserting a variety of claims arising out of two agreements, and the circumstances surrounding those agreements, entered into between the parties. (Doc. 17). BTC subsequently filed counterclaims against TCA and TDS (collectively referred to, where appropriate, as the "Counter-Defendants") regarding those same agreements. (Doc. 40). This matter is presently before the Court on the Counter-Defendants' Motion to Dismiss Count VI of BTC's counterclaim and to strike BTC's demand for punitive damages (Doc. 42), and BTC's Response thereto (Doc. 45).

**I.     Background**

A. Parties

The Counter-Defendants are Florida limited liability companies with their principal place of business in Orlando, Florida.  BTC is a Texas non-profit corporation conducting business in Florida.  Cothran is BTC's Chief Executive Officer.

B. Facts

TCA and BTC entered into a Work for Hire Supply and Processing Agreement ("WFH Agreement") on December 30, 2003, in which BTC agreed to produce a minimum of two hundred allograft constructs per month for five years under a specific fee schedule, using TCA's equipment.[1]  TDS and BTC entered into a Base Bone Supply and Processing Agreement ("Bone Agreement") (collectively referred to, where appropriate, with the WFH Agreement as the "Agreements") on March 11, 2004, in which BTC agreed to supply at least three to five donors per month and to provide processing services for those donors for five years under a specific fee schedule.

BTC produced allograft materials that the Counter-Defendants purchased and then sold to an entity named Blackstone Medical Inc. ("Blackstone").  The Counter-Defendants repeatedly assured BTC that Blackstone had unlimited demand for BTC's products based on a long-term contract the Counter-Defendants had signed with Blackstone.  The Counter-Defendants also assured BTC that they would make available twenty "prime age donors" per month to fill the purchase orders arising from the Blackstone contract.  BTC thus committed "virtually all of its

---

[1] An "allograft" is a graft of tissue from a donor of the same species as the recipient. *See* Medline Plus, U.S. National Library of Medicine, *available at* http://www.nlm.nih.gov/medlineplus/mplusdictionary.html (last modified February 4, 2003).

capacity" to producing products that the Counter-Defendants could sell to Blackstone.[2]  BTC also declined to pursue business opportunities with other entities based on the Counter-Defendants' assurances of unlimited demand.

After August of 2005, the Counter-Defendants did not produce any purchase orders to BTC for products to be sold to Blackstone.  The Counter-Defendants made repeated promises to BTC from August through October of 2005 that "such purchase orders would be arriving shortly."  Despite those promises, by late October of 2005 it became clear to BTC that no such purchase orders would be forthcoming and that the Counter-Defendants were unable to provide the twenty prime age donors per month.  BTC was thus forced to close its processing operations.  BTC subsequently learned that Blackstone terminated its contract with the Counter-Defendants in July of 2004.  BTC thus asserts that the Counter-Defendants' assertions of "unlimited demand" from Blackstone were knowingly false at the time they were made.

BTC alleges that it provided products and services to the Counter-Defendants in an amount totaling $342,175, and that this amount is reflected in invoices dated between July 30, 2005 and early November of 2005.  These invoices, which indicate that payment was due upon receipt, are overdue, and BTC has not received payment despite making demands therefor.[3]

C. Claims and Arguments

BTC has asserted a number of counterclaims against the Counter-Defendants, including a claim for fraudulent inducement (Count VI).  In support of that claim, BTC alleges that: (1) prior

---

[2] The products BTC produced for ultimate sale to Blackstone were "proprietary products and were based on Blackstone patents," and thus they could not be sold to other purchasers.

[3] BTC alleges that the Counter-Defendants have neither challenged nor objected to the amount of the invoices.

to signing the Agreements, the parties engaged in discussions in which two employees/agents of the Counter-Defendants, on behalf of the Counter-Defendants, told BTC that the Counter-Defendants would provide BTC with three to five donors per month; (2) those statements induced BTC to sign the Agreements, and BTC would not have signed the Agreements but for those statements; (3) those statements were false because the Counter-Defendants did not have access to three to five donors per month; (4) the Counter-Defendants failed to provide the promised donors to BTC; and (5) as a result, BTC incurred damages.  BTC also asserts claims for punitive damages in Count VI and in its claim for fraudulent misrepresentation (Count IV).

The Counter-Defendants have moved to dismiss Count VI and to strike the punitive damages claims, arguing that: (1) parties that have entered into a contract cannot claim that they were fraudulently induced to do so by prior oral misrepresentations that contradict the language of the contract; (2) the Agreements both have merger/integration clauses stating that the Agreements supercede all prior agreements; and (3) BTC's claims for punitive damages are improper because BTC has failed to comply with the requirements of Florida Statute section 768.72 governing such claims.  In response, BTC argues that: (1) the allegedly fraudulent statement in question is not expressly contradicted by the terms of the Agreements; (2) the course of performance between the parties demonstrated that the parties were aware that BTC could not provide sufficient donors;[4] (3) the merger/integration clauses are not applicable because the Agreements were induced by fraud; and (4) Florida Statute section 768.72 does not apply in Federal Court.

---

[4] The Court rejects this "course of performance" argument, because there are no allegations to support it.  In its Response, BTC acknowledged as much.  (*See* Doc. 45 at 9).

**II.     Standard of Review**

In ruling on a motion to dismiss, this Court must view the complaint in the light most favorable to the Plaintiff, *Cannon v. Macon County*, 1 F.3d 1558, 1565 (11th Cir. 1993), and must limit its consideration to the pleadings and any exhibits attached thereto. FED. R. CIV. P. 10(c); *see also GSW, Inc. v. Long County, Ga.*, 999 F.2d 1508, 1510 (11th Cir. 1993). The Court will liberally construe the complaint's allegations in the Plaintiff's favor, *Jenkins v. McKeithen*, 395 U.S. 411, 421 (1969), and will not dismiss a complaint for failure to state a claim unless it appears beyond a doubt that the Plaintiff cannot prove any set of facts that support a claim for relief. *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). In ruling on a motion to dismiss, "conclusory allegations, unwarranted factual deductions or legal conclusions masquerading as facts will not prevent dismissal." *Davila v. Delta Air Lines, Inc.*, 326 F.3d 1183, 1185 (11th Cir. 2003).

In reviewing a complaint on a motion to dismiss under Federal Rule of Civil Procedure ("Rule") 12(b)(6), the rule to be applied is that, "courts must be mindful that the Federal Rules require only that the complaint contain a short and plain statement of the claim showing that the pleader is entitled to relief." *U.S. v. Baxter Intern., Inc.*, 345 F.3d 866, 880 (11th Cir. 2003) (*citing* FED. R. CIV. P. 8(a)). This is a liberal pleading requirement, one that does not require a plaintiff to plead with particularity every element of a cause of action. *Roe v. Aware Woman Ctr. for Choice, Inc.*, 253 F.3d 678, 683 (11th Cir. 2001). Instead, the complaint need only "contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory." *Id*. (internal citation and quotation omitted). "A complaint need not specify in detail the precise theory giving rise to recovery. All that is required is that the defendant be on notice as to the claim being asserted against him and the grounds on which it

rests." *Sams v. United Food and Comm'l Workers Int'l Union*, 866 F.2d 1380, 1384 (11th Cir. 1989).

**III.     Legal Analysis**

   A. The Agreements

The parties' dispute centers on whether the Agreements addressed the question of who was to supply donors and, more specifically, whether the Counter-Defendants were to supply donors for BTC's procurement of tissue. Both of the Agreements contain language regarding the procurement of tissue. The WFH Agreement states, in relevant part, that

> [BTC][5] agrees to produce a minimum of 200 Constructs per month. [BTC] agrees to exert all efforts to acquire sufficient allograft processing material to fulfill orders by TissueNet and understands that time is of the essence in fulfilling such orders. As demand for such materials increases, [BTC] and TissueNet mutually agree to exert best efforts to make available sufficient allograft material for TissueNet orders.

(Doc. 17, Att. 1 at 1).[6]  The Bone Agreement contains similar language, as follows:

> TissueNet hereby engages [BTC] to perform the following services:
>      (a) procurement of base bone tissue . . .
>      (b) Processing of base bone (non-precision tooled) grafts (the "Grafts") pursuant to TissueNet's precise written specifications . . .
>      (c) Donor recovery and processing (at maximum donor yields) for Grafts . . .
> [BTC] agrees to satisfy all written orders by TissueNet for Grafts, including, without limitation, continuous processing, thereby processing a total of three to five (3 to 5) donors per month, unless reduced at TissueNet's sole discretion. [BTC] agrees to acquire sufficient raw material to fulfill all orders by TissueNet and

---

[5] BTC is referred to in the Agreements as "Tissue Bank." (*See* Doc. 17, Att. 1 at 1, 10; Att. 2 at 1, 8; *see also* Doc. 42 at 3 ("BTC is defined as the 'Tissue Bank' in both contracts.")). For the purposes of clarity, the Court will substitute "BTC" for "Tissue Bank" where appropriate.

[6] The WFH Agreement also contains a clause noting that "[BTC] recovers, procures, processes and distributes allograft tissue." (Doc. 17, Att. 1 at 1).

>understands that time is of the essence in fulfilling such orders.  As demand for materials increases, [BTC] therefore agrees to make its best efforts to make available sufficient raw material for Tissue Net orders in an effort to fill such expected orders. . . .[U]nderstanding the unpredictable nature of base bone processing, [BTC] agrees to use best efforts in maximizing donor yields on a per donor basis and in maximizing donor availability.

(Doc. 17, Att. 2 at 1-2).[7]  BTC asserts that its agreements to produce constructs and grafts were premised on having sufficient donors to produce those constructs and grafts, the only way it could do so was if the Counter-Defendants provided BTC with donors, and that the Counter-Defendants agreed to provide BTC with those donors as part of the Counter-Defendants' "best efforts."  (*See* Doc. 45 at 5-7).

B. Fraud in the Inducement

The elements of a claim for fraud in the inducement are:

(1) that the defendant misrepresented a material fact; (2) that the defendant knew or should have known that the statement was false; (3) that the defendant intended that the representation would induce the plaintiff to enter into a contract or business relation; and (4) that the plaintiff was injured by acting in justifiable reliance on the misrepresentation.

*Barnes v. Burger King Corp.*, 932 F. Supp. 1420, (S.D. Fla. 1996); *see also Pettinelli v. Danzig*, 722 F.2d 706, 709 (11th Cir. 1984).  The Counter-Defendants argue that the Agreements both contain integration and merger clauses, rendering BTC's reliance on any previous oral promises unjustifiable.  *See Ungerleider v. Gordon*, 936 F. Supp. 915, 917 (M.D. Fla. 1996).  Normally, this argument would be correct.  However, BTC has alleged that its participation in the Agreements was procured by fraud, and "if a party alleges that a contract was procured by fraud or

---

[7] The Bone Agreement also contains a clause noting that "[BTC] recovers, procures, processes and distributes allograft tissue." (Doc. 17, Att. 2 at 1).

misrepresentation as to a material fact, an integration clause will not make the contract incontestable, and the oral representation may be introduced into evidence to establish fraud." *MeterLogic, Inc. v. Copier Solutions, Inc.*, 126 F. Supp. 2d 1346, 1363 (S.D. Fla. 2000); *see also Mejia v. Jurich*, 781 So. 2d 1175, 1178 (Fla. 3rd DCA 2001). That exception, however, "is inapplicable . . . where the alleged fraudulent inducement is explicitly contradictory to a specific and unambiguous provision of the contract." *Acquisition Corp. of Am. v. FDIC*, 760 F. Supp. 1558, 1561 n.6 (S.D. Fla. 1991). This is so because parties "cannot recover in fraud for alleged oral misrepresentations that are adequately covered or expressly contradicted in a later written contract." *Hillcrest Pacific Corp. v. Yamamura*, 727 So. 2d 1053, (Fla. 4th DCA 1999); see also *Engelzios v. Batmasian*, 593 So. 2d 1077, 1078 (Fla. 4th DCA 1992) ("party may not recover in fraud for an alleged oral misrepresentation which is adequately dealt with in a later written contract"); *Rosa v. Amoco Oil Co.*, 262 F. Supp. 2d 1364, 1366 (S.D. Fla. 2003) ("statements or misrepresentations made to induce an individual to enter a contract, if later contained within the terms of the actual contract, cannot constitute a basis on which to bring a fraud claim").

The issue is thus whether the alleged representations by the Counter-Defendants that they would supply donors to BTC are dealt with and/or contradicted by the language of the Agreements. The WFH Agreement and the Bone Agreement provide, respectively, that "[BTC] agrees to exert all efforts to acquire sufficient allograft processing material to fulfill orders by TissueNet," (Doc. 17, Att. 1 at 1), and that "[BTC] agrees to acquire sufficient raw material to fulfill all orders by TissueNet," (Doc. 17, Att. 2 at 1). As BTC explained,

> a "donor" is basically a deceased person who donated his/her tissue products. When an entity like The BTC "receives" a "donor," The BTC is not receiving a cadaver; rather, it is receiving a bag of tissues obtained from a cadaver. The BTC

>   then "cuts" the tissue in a precise manner depending upon the needs of entities that purchase such tissue from The BTC.

(Doc. 45 at 2 n.1). Further, the allograft processing material and constructs referenced in the WFH Agreement are "in fact tissue from a donor." (*Id*. at 5 n.3).[8] Therefore, the only reasonable reading of the pertinent language from the Agreements is that BTC was obligated to acquire and/or supply the tissue material necessary for use in fulfilling the Counter-Defendants' orders.[9] This obligation is specifically addressed in clear terms in the Agreements, terms which omit any mention of such an obligation on the part of the Counter-Defendants.[10] The alleged oral representation by the Counter-Defendants that they would supply donors (tissue for processing) to BTC is thus, at the very least adequately addressed, if not specifically contradicted, by the language of the Agreements. Therefore BTC cannot rely on that representation as a basis for its claim for fraud in the inducement, and thus that claim must fail.

---

[8] The Court presumes that the same references apply to the terms "tissue" and "graft" in the Bone Agreement. (*See* Doc. 45 at 6 n.4).

[9] The "best efforts" language upon which BTC relies is found in a sentence in the WFH Agreements stating in its entirety that "*[a]s demand for such materials increases*, [BTC] and TissueNet mutually agree to exert best efforts to make available sufficient allograft material for TissueNet orders.*"* (Doc. 17, Att. 1 at 1) (emphasis supplied). The Counter-Defendants' obligation to use best efforts to provide sufficient tissue material thus applied in cases where demand had increased. BTC has not alleged that such a situation existed and thus has not demonstrated that the Counter-Defendants' obligation to participate in providing donors (tissue material for processing) was triggered. In the Bone Agreement this sentence only references BTC's obligation to use best efforts, and omits any reference to the Counter-Defendants' alleged obligation to provide BTC with anything. Therefore, the "best efforts" language is not relevant to the Court's determination of whether the alleged oral misrepresentations are addressed or contradicted by the language of the Agreements.

[10] Indeed, Schedule A to the Bone Agreement specifically provides that "[BTC] agrees to supply TissueNet with three (3) to five (5) donors per month, i.e. forty-five (45) donors per year on average." (Doc. 17, Att. 2 at 8).

C. Punitive Damages

The Eleventh Circuit has specifically held that

> Florida Statute § 768.72 conflicts with and must yield to the "short and plain statement" rule contained in Federal Rule of Civil Procedure 8(a)(3), and as a result a Florida plaintiff in federal court because of diversity jurisdiction need not obtain leave of court before pleading a request for punitive damages.

*Cohen v. Office Depot, Inc.*, 204 F.3d 1069, 1072 (11th Cir. 2000).  Therefore, the Counter-Defendants' Motion to Strike BTC's punitive damages claims for failure to comply with Florida Statute section 768.72 will be denied.[11]

## IV.   Conclusion

For the reasons stated herein, it is

**ORDERED THAT** the Counter-Defendants' Motion to Dismiss (Doc. 42) is GRANTED in part, and Count VI of BTC's Amended Counterclaim (Doc. 40) is DISMISSED.  The Counter-Defendants' Motion to Strike BTC's punitive damages claim (Doc. 42) is DENIED.

**DONE** and **ORDERED** in Chambers, Orlando, Florida on June 1, 2006.

GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Party

---

[11] Inasmuch as the Court has determined that Count VI is to be dismissed (including the punitive damages claim contained therein), this conclusion applies only to the punitive damages claim in Count IV.