**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**TISSUENET CUSTOM APPLICATIONS,**
**LLC & TISSUENET DISTRIBUTION**
**SERVICES, LLC,**

                    **Plaintiffs,**

**-vs-**                                                      **Case No.  6:05-cv-1931-Orl-31KRS**

**BLOOD & TISSUE CENTER OF**
**CENTRAL TEXAS & MARSHALL G.**
**COTHRAN,**

                    **Defendants.**

_____

**BLOOD AND TISSUE CENTER OF**
**CENTRAL TEXAS, MARSHALL G.**
**COTHRAN,**
          **Counter Claimants,**
**vs.**

**ALAN NOVOTNY, TISSUENET**
**DISTRIBUTION SERVICES, LLC and**
**TISSUENET CUSTOM APPLICATIONS,**
**LLC,**

                    **Counter Defendants.**

_____

## ORDER

This matter is presently before the Court on the Defendant, Marshall Cothran's ("Cothran")

Objection (Doc. 58) to the Magistrate Judge's Report and Recommendation (Doc. 55), which

recommended that the Court deny Cothran's Motion to Dismiss for lack of personal jurisdiction

(Doc. 25).  Cothran raises a narrow issue, arguing that the Magistrate Judge incorrectly conducted the burden-shifting analysis required when a defendant challenges personal jurisdiction.

**I.      Law to be Applied**

A. Review of Report and Recommendation

In determining whether to accept, reject, or modify a magistrate's report and recommendations, this Court has the duty to conduct a careful and complete review.  *Williams v. Wainwright*, 681 F.2d 732 (11th Cir. 1982); *O'Reardon v. Principal Life Ins. Co.*, 301 F. Supp. 2d 1323, 1324 (M.D. Fla. 2004) (court should conduct *de novo* review regardless of whether parties file objections).

B. Personal Jurisdiction and the Burden-Shifting Analysis

When a federal court sits in diversity, the presence of personal jurisdiction is determined according to the law of the state in which that district court sits.  *Prentice v. Prentice Colour, Inc.*, 779 F. Supp. 578, 581 (M.D. Fla. 1991).  Thus, the Court looks to Florida's long arm statute, which the Court must strictly construe as would the Florida Supreme Court.  *Id*.; *see also Miami Breakers Soccer Club, Inc. v. Women's United Soccer Assn.*, 140 F. Supp. 2d 1325, 1328 (S.D. Fla. 2001).  Florida Statute section 48.193 provides, in relevant part:

> Any person, whether or not a citizen or resident of this state, who personally or through an agent does any of the acts enumerated in this subsection thereby submits himself or herself and, if he or she is a natural person, his or her personal representative to the jurisdiction of the courts of this state for any cause of action arising from the doing of any of the following acts:
>                                                    . . .
>    (b) Committing a tortious act within this state.

Fla. Stat. § 48.193(1).[1]

---

[1] In their Amended Complaint, the Plaintiffs allege that Cothran "committed a tortious act within this state."  (Doc. 17 at 2).

"Under Florida law, a plaintiff seeking to subject a nonresident defendant to jurisdiction of the court through the long-arm statute must do more than allege facts that show a possibility of jurisdiction." *Jet Charter Serv., Inc. v. Koeck*, 907 F.2d 1110, 1112 (11th Cir. 1990).  The plaintiff must plead facts in its complaint to support personal jurisdiction over the defendant.  *Miami Breakers*, 140 F. Supp. 2d at 1328.  The burden then shifts to the defendant, who may challenge the plaintiff's jurisdictional allegations by affidavits, testimony, or other evidence inconsistent with or contrary to the statutory basis for jurisdiction.  *Id*.; *see also Coca-Cola Foods v. Empresa Comercial Internacional de Frutas S.A.*, 941 F. Supp. 1175, (M.D. Fla. 1996).  If the defendant successfully challenges the plaintiff's jurisdictional allegations, the burden shifts back to the plaintiff to substantiate its allegations of jurisdiction by affidavits, testimony or other documents. *Miami Breakers*, 140 F. Supp. 2d at 1328; *Jet Charter*, 907 F.2d at 1112 ("burden shifts to the plaintiff to prove jurisdiction by affidavits, testimony or documents").

The plaintiff "must then affirmatively support its jurisdictional assertions and may not merely rely on the allegations of the complaint."  *Prentice*, 779 F. Supp. at 586; *see also Coca-Cola*, 941 F. Supp. at 1178 ("Upon shifting the burden back to the plaintiff, the non-moving party may not rest merely upon allegations or denials in his pleading but his response by affidavit or otherwise must set forth specific facts showing the court has jurisdiction.") (internal citation and quotation omitted).  In other words, the burden of proving facts that justify the use of the jurisdictional statute rests on the plaintiff.  *Coca-Cola*, 941 F. Supp. at 1179; *Morris v. SSE, Inc.*, 843 F.2d 489, 492 (11th Cir. 1988) ("[T]he plaintiff bears the burden of establishing a prima facie case of jurisdiction over the movant, non-resident defendant.").  When a court does not conduct an evidentiary hearing on a motion to dismiss for lack of jurisdiction, the plaintiff must establish a

prima facie case of personal jurisdiction by presenting sufficient evidence to withstand a motion

for directed verdict. *S.E.C. v. Carrillo*, 115 F.3d 1540, 1542 (11th Cir. 1997); *Coca-Cola*, 941 F.

Supp. at 1178.

The alleged tortious act upon which the Plaintiffs rely to assert personal jurisdiction over

Cothran under Florida Statute section 48.193 is fraudulent misrepresentation.  As stated by the

Magistrate Judge, the elements of a claim of fraudulent misrepresentation are:

> (1) a false statement concerning a material fact; (2) the representor's knowledge
> that the representation is false; (3) an intention that the representation induce
> another to act on it; and, (4) consequent injury by the party acting in reliance on the
> representation.

(Doc. 55 at 14) (internal citation and quotation omitted).  The Magistrate Judge concluded that

there was sufficient evidence to conclude that Cothran made a false statement, thus satisfying the

first element.  (*Id*. at 15-17).  Cothran's objection to the Magistrate Judge's Report and

Recommendation focuses on the second element: whether Cothran knew that the alleged

representations were false.  Cothran argues that he has provided evidence demonstrating the

absence of this second element, and asserts that the Plaintiffs have failed to carry their burden of

rebutting his evidence, and therefore have failed to demonstrate all the elements of the alleged

tortious act and, thus, have failed to prove facts justifying the use of the jurisdictional statute.

The issue is thus whether the Plaintiffs have carried their burden of demonstrating, by

providing appropriate evidence, that personal jurisdiction over Cothran is proper using the long

arm statute's "tortious act" provision.  Put another way, the question is whether the Plaintiffs have

provided evidence demonstrating that Cothran in fact committed the tortious act alleged because,

if not, then the statutory basis for personal jurisdiction alleged by the Plaintiffs does not exist.

To resolve this matter, the Court, following the burden-shifting analysis, turns first to the allegations, then the evidence Cothran provided, and, finally, to the evidence with which the Plaintiffs responded.

## II.     Allegations and Evidence

A. Allegations in the Amended Complaint

TissueNet Custom Applications, LLC ("TCA") and The Blood and Tissue Center of Central Texas ("BTC") entered into a Work for Hire Supply and Processing Agreement ("WFH Agreement") on December 30, 2003, in which BTC agreed to produce a minimum of two hundred allograft constructs per month for five years under a specific fee schedule, using TCA's equipment.[2]  TissueNet Distribution Services, LLC ("TDS") and BTC entered into a Base Bone Supply and Processing Agreement ("Bone Agreement") (collectively referred to, where appropriate, with the WFH Agreement as the "Agreements") on March 11, 2004, in which BTC agreed to supply at least three to five donors per month and to provide processing services for those donors for five years under a specific fee schedule.

Prior to May 2005, Cothran (BTC's Chief Executive Officer), along with other BTC officers, told the Plaintiffs that BTC was committed to staying in the tissue processing business despite recent financial losses.  Also in May of 2005, the Plaintiffs advised BTC that the Plaintiffs were negotiating with other tissue processing facilities to begin taking surplus orders because BTC was not able to keep up with all of the Plaintiffs' orders.  Then, on May 16, 2005, Cothran, along

---

[2] An "allograft" is a graft of tissue from a donor of the same species as the recipient. *See* Medline Plus, U.S. National Library of Medicine, *available at* http://www.nlm.nih.gov/medlineplus/mplusdictionary.html (last modified February 4, 2003).

with other BTC officers, visited the Plaintiffs' offices in Orlando, Florida, and during that meeting

Cothran repeatedly told the Plaintiffs that BTC could and would take on additional tissue

processing for the Plaintiffs.  Cothran also indicated that BTC intended to grow to meet the

Plaintiffs' needs, and that he believed that there was an opportunity to expand and grow with the

Plaintiffs.  Cothran urged the Plaintiffs not to negotiate with other suppliers.

On September 5-7, 2005, Plaintiffs' agents visited BTC, and during that visit Cothran

stated that BTC was doing well financially and was looking forward to expanding its relationship

with the Plaintiffs.  Between the May and September 2005 meetings, Cothran told the Plaintiffs

that he and BTC intended to grow and expand with the Plaintiffs to meet their needs.  Immediately

after the Plaintiffs' agents' visit to BTC, BTC visited with one of the Plaintiffs' suppliers to

perform an audit.[3]

However, in October of 2005, after receiving approximately $750,000 from TCA and TDS

under both Agreements, BTC advised the Plaintiffs that it would cease performance under those

Agreements.[4]   Then, on November 17, 2005, the BTC Board of Trustees voted to close BTC's

tissue processing operation as of December 1, 2005.  BTC closed its processing operations on

December 1, 2005, causing Plaintiffs to lose BTC as a supplier of processed tissue.

The Plaintiffs allege that at the same time Cothran was making the representations to the

Plaintiffs, he was also negotiating an agreement or arrangement with LifeNet to outsource

---

[3] The Plaintiffs allege that this audit confirmed Cothran's statements that BTC intended to continue and expand its relationship with the Plaintiffs.

[4] The Agreements do not allow for early termination by BTC.

processing of tissue products.  On the same date that BTC closed its processing operations, BTC

began to operate under its agreement with LifeNet.

      B. Cothran's Evidence

      Cothran submitted evidence, which demonstrates that LifeNet had processed

cardiovascular tissue for BTC for many years.[5]  (Doc. 25, Att. 3 at 2; Doc. 48, Att. 3 at 4).[6]

However, BTC did not contact LifeNet about BTC's interest in outsourcing its musculoskeletal

tissue processing until mid-October of 2005.[7]  (Doc. 25, Att. 3 at 2; *see also* Doc. 25, Att. 5 at 2).[8]

Shortly after BTC's mid-October inquiry, LifeNet submitted a proposal to BTC for BTC to

outsource its musculoskeletal tissue processing to LifeNet.  (Doc. 25, Att. 3 at 2).  BTC informed

LifeNet on November 17, 2005, that BTC's board of trustees had accepted LifeNet's proposal.

(Id.).  Then, beginning on November 17, 2005, LifeNet and BTC entered into contract

negotiations, which carried on until the last week of January, 2006, at which point LifeNet and

---

[5] BTC never processed cardiovascular tissue for TissueNet.  (Doc. 48, Att. 3 at 5).

[6] Cothran's deposition, submitted by the Plaintiffs, indicates the same thing.  (Doc. 47, Att. 4 at 42).

[7] This is consistent with Cothran's deposition.  (Doc. 47, Att. 4 at 43).

[8] BTC received financial information from the month of September, 2005, in early October, and Cothran saw that BTC's net operating losses, which had been increasing, had started increasing much faster.  (Doc. 47, Att. 5 at 53).  BTC had been depending on TissueNet's business to reverse that trend, and BTC had been advising them (at least since July of 2005) that BTC needed more orders and more donors.  (Id. at 53-54).  However, no orders or donors were produced, and BTC had to stop the losses, and so they "had to pull the plug in order to survive."  (Id. at 54).  Ultimately, BTC decided that it was not financially feasible to continue operating a tissue processing facility that complied with current good tissue practices.  (Id. at 67-68).  It appears that at that same time, BTC contacted LifeNet, among others, about outsourcing its tissue processing.

BTC signed a contract regarding BTC's outsourcing of tissue processing. (Doc. 25, Att. 3 at 2; Doc. 25, att. 5 at 2; Doc. 48, Att. 3 at 4).[9]

C. Plaintiffs' Evidence

The Plaintiffs' affidavits state that prior to May, 2005, Cothran told TissueNet that BTC was committed to staying in the tissue processing business, and that on May 16, 2005, Cothran told TissueNet that BTC could and would take on additional tissue processing for TissueNet, and that BTC intended to grow to meet TissueNet's needs. (Doc. 30, Att. 2 at 3; Doc. 47, Att. 2 at 3). Cothran also urged TissueNet not to negotiate with other suppliers or build their own facility. (Doc. 30, Att. 2 at 3; Doc. 47, Att. 2 at 3). Then, during a meeting on September 5 through 7, 2005, Cothran again stated that BTC was doing well financially and was looking forward to expanding its relationship with TissueNet.[10] (Id.). However, in October, 2005, BTC advised TissueNet that it would cease performance under both Agreements, and then on November 7, 2005, BTC advised TissueNet that BTC had explored outsourcing of processing tissue and indicated that LifeNet was in negotiations with BTC. (Id. at 4).

Alan Novotny, TCA's Chief Executive Officer, states that he believes that an agreement such as the one between BTC and TissueNet would take several months to assemble, and concludes from that belief and the fact that a November press release announced a new partnership

[9] The negotiation of the BTC-LifeNet contract thus took over two months. By way of comparison, both Agreements at issue in this case were negotiated in less than three months. (Doc. 48, Att. 3 at 5).

[10] Cothran asserts that he never discussed BTC's financial performance with TissueNet at either the May or September meetings. (Doc. 48, Att. 3 at 5). Where the evidence conflicts, the Court construes all reasonable inferences in favor of the Plaintiff. *S.E.C. v. Carrillo*, 115 F.3d 1540, 1542 (11th Cir. 1997).

between BTC and LifeNet, that BTC had to be negotiating with LifeNet at the same time that

Cothran was telling TissueNet that BTC could take on additional tissue processing for TissueNet.

(Doc. 30, Att. 2 at 5; see also Doc. 47, Att. 2 at 4). Novotny concludes that it is his belief that

Cothran knew at the time he told TissueNet that BTC would expand to meet TissueNet's needs

that those representations were false and that Cothran intended to make an arrangement with

LifeNet instead. (Doc. 30, Att. 2 at 6).

## III.    Legal Analysis

Based on the Plaintiffs' allegations, (*see* Doc. 17 at 5-7, ¶¶ 28, 30, 33, 38, 39), it is clear

that the Plaintiffs' claim of fraudulent misrepresentation arises solely from Cothran's alleged

misrepresentation that BTC would expand its tissue processing operation to meet the Plaintiffs'

needs. Cothran has conceded that the Plaintiffs have properly alleged a claim of fraudulent

misrepresentation. (*See* Doc. 58 at 5). Cothran argues, however, that any such representations

were not false because, contrary to the Plaintiffs' assertions, he had not been negotiating with

LifeNet, and did not in fact begin negotiations with LifeNet until October of 2005, well after he

made the statements in question to the Plaintiffs. Cothran has submitted evidence clearly

demonstrating that BTC did not contact LifeNet until mid-October, shortly thereafter LifeNet

submitted a proposal, and BTC and LifeNet then entered into contractual negotiations in mid-

November of 2005.

The Plaintiffs have offered no competent evidence to rebut Cothran's position. At best,

they have provided Novotny's affidavit in which he only offers his belief that the type of contract

entered into between BTC and LifeNet would take more than three months to negotiate, and his

belief that Cothran knew his representations to the Plaintiffs were false. This sort of speculation is

not the type of evidence that would survive a directed verdict motion, and thus is not sufficient to

carry the Plaintiffs' burden here.  Next, the Plaintiffs argue that because Cothran knew that

LifeNet could process musculoskeletal tissue for BTC before September 5, 2005 (because LifeNet

was already processing other tissue for BTC), "[t]his substantiates the allegation that Mr. Cothran

knew at the time of making the representations to Plaintiffs about expanding to meet Plaintiffs'

needs that they were false as he intended to make an arrangement with LifeNet."  (Doc. 59 at 4).

The mere fact that LifeNet was processing other tissue products for BTC, and the fact that Cothran

knew that LifeNet could process musculoskeletal tissue prior to September of 2005, however, does

not demonstrate that Cothran consciously made misrepresentations to the Plaintiffs.[11]

Ultimately, the uncontradicted evidence is that BTC did not contact LifeNet about

outsourcing its tissue processing until mid-October of 2005, well after Cothran made the

statements at issue.  Therefore, the Plaintiffs have failed to offer evidence demonstrating that

Cothran knew his representations were false at the time he made them, and thus have failed to

support their claim for fraudulent misrepresentation.  Therefore the Plaintiffs have failed to prove

facts justifying the use of Florida's long arm statute's tortious act provision as a basis for personal

jurisdiction over Cothran.

---

[11] Certainly, one could interpret this evidence to suggest, at most, that Cothran was considering a business relationship with LifeNet for outsourcing BTC's tissue processing.  That alone, however, does not demonstrate that Cothran knowingly made misrepresentations to the Plaintiffs about BTC's intentions to expand their business to meet the Plaintiffs' needs.  This is made even more clear when one considers that the last statement Cothran made about expanding BTC's operations was in early September of 2005, and BTC did not contact LifeNet for over one month after that regarding outsourcing.

**IV.     Conclusion**

For the reasons stated herein, the Court finds that the Magistrate Judge's conclusion that "the Court may exercise specific personal jurisdiction over Cothran" was incorrect, and thus Cothran's objection to the Report and Recommendation will be sustained.  Having found that the Court could exercise specific personal jurisdiction, however, the Magistrate Judge did not address the exercise of general personal jurisdiction, (*see* Doc. 55 at 21), an issue that must now be addressed.  Accordingly, it is

**ORDERED THAT** Cothran's Objection to the Magistrate Judge's Report and Recommendation is SUSTAINED.  This matter is referred to the Magistrate Judge for a determination on the issue of whether the Court may exercise general personal jurisdiction over Cothran.

**DONE** and **ORDERED** in Chambers, Orlando, Florida on August 14, 2006.

Copies furnished to:

Counsel of Record
Unrepresented Party

GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE